662 A.2d 960

GILLIAN IMPEY, PETITIONER–APPELLANT, v. BOARD OF
EDUCATION OF THE BOROUGH OF SHREWSBURY,
RESPONDENT–RESPONDENT.

Argued January 31, 1995—Decided August 14, 1995.

*Stephen B. Hunter* argued the cause for appellant (*Klausner, Hunter, Cige & Seid,* attorneys).

*Nathanya G. Simon* argued the cause for respondent (*Schwartz, Simon, Edelstein, Celso & Kessler,* attorneys; *Ms. Simon* and *Jeffrey A. Bennett,* on the brief).

*David Earle Powers,* Deputy Attorney General, argued the cause for respondent State Board of Education (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*Richard A. Friedman* argued the cause for *amicus curiae* New Jersey Education Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

*Kim Chapman,* Associate Counsel, argued the cause for *amicus curiae* New Jersey School Boards Association (*Susan E. Galante,* Director, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case, a local board of education, for reasons of economy, entered into a contract with a county educational services commission to provide speech correction services for the school district's pupils. Concomitantly, the board abolished the permanent part-time position and terminated the employment of a tenured part-time speech correctionist. The issues raised by those actions are whether a board of education has the authority to subcontract with a county educational services commission to provide speech correction services and, in doing so, whether the board may abolish the position and terminate the employment of a tenured teacher without violating statutory tenure rights.

I

Gillian Impey (petitioner) was a tenured teacher employed by the Board of Education for the Borough of Shrewsbury (Board) as a part-time speech correctionist. She provided speech correction services for the pupils of the Shrewsbury School District.

In July 1990, the Board voted to contract with the Educational Services Commission (ESC) of Monmouth County to provide speech correction services for the district's pupils during the 1990–1991 school year, and to abolish petitioner's position. Petitioner's annual salary was slightly more than $20,000; the Board agreed to pay the ESC $8,000 to provide the equivalent speech correction services. As a result of this subcontracting arrangement with the ESC, the Board saved approximately $12,000.

Petitioner filed a complaint with the Commissioner of Education, claiming that the Board's action violated her tenure, seniority and re-employment rights. She also asserted that the Board did not have the authority to enter into a subcontracting relationship with the ESC to provide speech correction services.

The Board filed its answer and affirmative defenses, and the matter was referred to the Office of Administrative Law.

In relevant part, the parties stipulated to the following facts:

1. Petitioner Gillian Impey, holds certification as a Speech Correctionist from the Department of Education, State Board of Examiners.

2. Petitioner Gilliam Impey was hired by the Shrewsbury Board of Education as [a] part-time Speech Correctionist effective March 1, 1970 through June 30, 1990.

3. By correspondence dated July 5, 1990 . . . the Board notified petitioner that the Board would discuss at a special meeting scheduled for Tuesday, July 10, 1990 the possibility of abolishing the position of Speech Correctionist.

4. At the Board's special meeting of July 10, 1990, the Board voted to abolish the position of Speech Correctionist for the 1990–1991 school year.

5. At the Board's special meeting of July 10, 1990, the Board also adopted a resolution terminating the employment of the petitioner as a result of the abolishment of [the] position and reduction in force. The Board further placed petitioner on a preferred eligibility list for re-employment in her area of seniority.

6. By correspondence dated July 11, 1990, . . . the Board advised the petitioner that [it] . . . adopted a resolution terminating her employment . . . as a result of [the] abolishment of position and reduction in force. Additionally, petitioner was advised that based upon her tenure and seniority rights, she had been placed on a preferred eligibility list for recall to the position of Speech Correctionist.

7. At the Board's special meeting of July 10, 1990, the Board approved a contract with the Monmouth County Educational Services Commission to provide speech services for the school district for the 1990–1991 school year for two days per week at a stipend of $20 per hour for five hours × two days per week for a total cost of $8,000 per year.

8. The Monmouth County Educational Services Commission is a duly established agency organized in accordance with *N.J.S.A.* 18A:6–51 with the purpose of carrying on programs of educational research and development and providing to public school districts such educational and administrative services as may be authorized pursuant to the Rules of the State Board of Education. At the meeting of the State Board of Education held on June 2, 1982, the Monmouth County Educational Services Commission was approved to provide special education services to public school districts pursuant to *N.J.S.A.* 18A:6–51, 63 and 69.

9. The Board's decision to abolish the position of Speech Correctionist and to contract with Monmouth County Educational Services Commission for speech services has had no adverse impact on the program needs of the school district for such speech services.

10. Petitioner's compensation for the 1989–1990 school year was . . . $20,325. Petitioner's salary for the 1990–1991 school year is yet undetermined due to unsettled negotiations.

11. The use of the Educational Services Commission has resulted in a savings to the School District of Shrewsbury in the amount of at least $12,325 for the

1990–1991 school year and for each year thereafter in which it participates in this contract arrangement.

12. The Shrewsbury School District is a K through 8 School District.... The total number of students involved in the speech program for the 1989–1990 school year was 37. The total number of students involved in the speech program for the 1990–1991 school year was 37. The number of students involved in the speech program for 1991–1992 school year is 40.

13. During the 1989–1990 school year, in addition to a Speech Correctionist, the Board employed a Learning Disability Teacher Consultant, School Psychologist and School Social Worker, and for the 1990–1991 school year the Board employed a School Psychologist and School Social Worker.

14. In Monmouth County, the following school districts utilize the Monmouth County Educational Services Commission for special education services by having one or more members of the Child Study Team exclusively supplied in a contractual arrangement by the Commission: Avon, Spring Lake Heights, Neptune City, Shrewsbury and Deal.

On cross-motions for summary decision, the Administrative Law Judge (ALJ) ruled in favor of the Board. The Commissioner and the State Board of Education adopted that determination. Thereafter, petitioner filed a Notice of Appeal with the Appellate Division, which affirmed the decisions of the State Board and the Commissioner. 273 *N.J.Super.* 429, 642 *A.*2d 419 (1994). Petitioner filed a petition for certification, which we granted. 138 *N.J.* 266, 649 *A.*2d 1286 (1994).

II

The Educational Services Commission of Monmouth County, with which the Shrewsbury Board of Education has contracted to obtain speech correction services for its pupils, is an agency established and organized in accordance with *N.J.S.A.* 18A:6–51. We address the threshold question of whether a local board of education has the statutory authority to contract with an ESC to provide speech correction services for its pupils.

Boards of education have considerable latitude in providing essential educational services. Services, facilities and programs of special education may be provided for in several ways. *E.g.,*

*N.J.S.A.* 18A:46–14. One avenue is through county educational services commissions.

An educational services commission is defined as

an agency established ... in one or more counties for the purpose of carrying on programs of educational research and development and providing to public school districts such educational and administrative services as may be authorized pursuant to rules of the State Board of Education.

[*N.J.S.A.* 18A:6–51.]

An ESC may be established by local boards of education with the concurrence of the Commissioner of Education on the approval of the State Board of Education. *N.J.S.A.* 18A:6–52. ESCs may provide a range of educational and administrative services. *See Remedial Educ. & Diagnostic Servs., Inc. v. Essex County Educ. Servs. Comm'n,* 191 *N.J.Super.* 524, 526–28, 468 *A.2d* 253 (App. Div.1983) (citing *N.J.S.A.* 18A:46–19.7, court confirmed local school board's authority to subcontract with an ESC to provide auxiliary and remedial services to handicapped pupils), *certif. denied,* 97 *N.J.* 601, 483 *A.2d* 139 (1984). An ESC "shall from time to time determine what services and programs shall be provided ... [and] enter into contracts with school districts, whether member districts of the commission or not, to provide any or all such services and programs." *N.J.S.A.* 18A:6–63.

Of special relevance in this case is the statutory and regulatory authority governing services to children in need of speech correction. The Classes and Facilities for Handicapped Children Act, *N.J.S.A.* 18A:46–1 to –46, requires that public schools provide special educational services for handicapped students. A board of education has a statutory responsibility "to provide suitable facilities and programs of education" for all handicapped children, *N.J.S.A.* 18A:46–13, including children who are "communication handicapped." *N.J.S.A.* 18A:46–1. "The facilities and programs of education required" for handicapped pupils may be provided by "[j]oint facilities including a class or classes ... to be provided by agreement between one or more school districts." *N.J.S.A.* 18A:46–14(c). Further, and specifically, "[a] board of education may contract with ... an educational services commission ... for

the provision of examination, classification and speech correction services required by this act." *N.J.S.A.* 18A:46–19.7.[1]

The services provided by the board of education for handicapped children are frequently administered by child study teams. Those services pertain to identification and diagnosis of children needing special educational services, development and approval of public school programs for handicapped pupils, supervision and coordination of public school programs for handicapped pupils, and reporting and referral of children with severe handicaps to appropriate agencies. *N.J.S.A.* 18A:46–5. "The basic child study team shall consist of a school psychologist, a learning disability teacher consultant and a school social worker." *N.J.S.A.* 18A:46–5.1. The Legislature has recognized that each board of education and each county need not have its own child study team for the purpose of providing services and/or performing functions relating to handicapped pupils. *See N.J.S.A.* 18A:46–5 ("Each county child study team shall function in consultation with the local boards of education in the county or the local boards of education in the counties served by it."). Thus, boards of educations are authorized to undertake programs "separately or jointly with one or more boards of education or State agencies [to] provide for basic child study team services." *N.J.S.A.* 18A:46–5.1.

The regulations of the Commissioner and State Board of Education implement the broad statutory authority in providing services for handicapped children. *N.J.A.C.* 6:28–1.1(f) ("Each district board of education, independently or through joint agree-

---

[1] New Jersey participates in the federal program to help finance the education of handicapped children. *See Lascari v. Bd. of Educ.*, 116 *N.J.* 30, 34, 560 *A.2d* 1180 (1989) (noting that receipt of federal funds is conditioned on the State's compliance with requirements of the Individuals with Disabilities Education Act, 20 *U.S.C.A.* § 1400 *et seq.*). Accordingly, the State is required to provide disabled children with "speech or language impairments," 20 *U.S.C.A.* 1401(a)(1)(A)(i), with special education and "related services." 20 *U.S.C.A.* 1400(c). "Related services" include services for "speech pathology," 34 *C.F.R.* 300.16(a), such as identification, diagnosis, appraisal and treatment of speech, language, or communicative impairments. *Id.* at 300.16(b)(13).

ments, shall employ child study teams, speech correctionists or speech-language specialists ... in numbers sufficient to ensure provision of required programs and services pursuant to this chapter."). The regulations explicitly recognize that a board may contract with an ESC to provide educational services for pupils with educational disabilities. *N.J.A.C.* 6:28–7.1(a). Moreover, *N.J.A.C.* 6:28–7.4(a) states that "[t]he educational program ... provided through contractual agreements ... [with an ESC] shall be considered the educational program of the district board of education. The district board of education shall be responsible for the services required in *N.J.A.C.* 6:28–3."

Petitioner contends that *N.J.A.C.* 6:28–3.1 requires that the members of the child study team that serve handicapped pupils be employed directly by the school district. That section provides:

A child study team shall consist of a school psychologist, a learning disabilities teacher-consultant and a school social worker. For pupils ages three to five, the study team shall include a speech correctionist or speech-language specialist. All members of the child study team shall be employees of a district board of education, have an identifiable, apportioned commitment to the local school district and shall be available during the hours pupils are in attendance.

[*N.J.A.C.* 6:28–3.1(b).]

Petitioner claims that she was a member of the child study team employed by the district, and her replacement by the ESC, consisting of non-district personnel, to provide the services of the child study team violates *N.J.A.C.* 6:28–3.1(b). However, the ALJ, Commissioner, and State Board of Education determined that petitioner, who served a K through 8 school, was not a member of the basic child study team referred to in *N.J.A.C.* 6:28–3.1. *Cf.* *N.J.S.A.* 18A:46–5.1 (omitting speech correctionist from definition of "basic child study team"). In addition, their determinations reflect that the other requirements of that regulation, which relate to the hours available and commitment to the school district's pupils, were satisfied.

We concur in the Appellate Division's conclusion that the Board was empowered to enter into the contract with the ESC for the provision of educational services. The statutory and regulatory provisions enable an ESC to provide a wide range of educational

service to local schools. Those enactments clearly authorize a local board of education to enter into a contract with an educational services commission to obtain speech correction services for its eligible pupils.

### III

■   Petitioner contends that under the circumstances the abolition of the position of speech correctionist and the termination of her employment violated her statutory tenure rights under *N.J.S.A.* 18A:28–10. Specifically, petitioner asserts that tenured professional employees must be retained by local boards of education for positions for which they are qualified, and that the reduction-in-force statute, *N.J.S.A.* 18A:28–9, cannot be used to replace tenured professional personnel with less expensive public employees pursuant to subcontracting arrangements.

We note, preliminarily, an additional argument made by the New Jersey Educational Association (NJEA), as *amicus.* It asserts that Chapter 28 of the Administrative Code, which was adopted to fulfill a State's requirement to provide special education services to its handicapped pupils, requires that each district board of education be responsible for providing a system of free, appropriate special education, supervised and provided by appropriately "certified professional staff members." *See N.J.A.C.* 6:28–1.1. The NJEA contends the term "certified professional staff members," *N.J.A.C.* 6:28–1.1(d)(2), refers to the Tenure Act, *N.J.S.A.* 18A:28–5, and thus, tenure protections extend to all staff members who hold appropriate certificates issued by the board of examiners.

■   We do not agree that the regulation confers tenure protection to all staff members who are certified special education providers. All teachers employed by school districts to provide special education must become eligible through certification. However, the reference to "certified staff members" in *N.J.A.C.* 6:28–1.1(d)(2) does not, as argued by *amicus,* mean tenured personnel. A tenured educator must be certified, but a certified

educator need not be tenured. *See Dennery v. Bd. of Educ.*, 131 *N.J.* 626, 622 *A.*2d 858 (1993).

Petitioner's principal argument that the Board did not legitimately effectuate a reduction in force stresses that the ESC is performing the same duties that petitioner previously performed as a part-time tenured speech correctionist, which indicates that the Board's intention was not an actual abolition of one part-time speech correctionist position, but rather a reorganization and transfer of speech correctionist duties to a less expensive provider. Accordingly, petitioner argues that the board violated her tenure rights under *N.J.S.A.* 18A:28–10. The Board responds that the termination of petitioner's employment was a valid "reduction" in the number of tenured teachers, as permitted by *N.J.S.A.* 18A:6–10, and that a cost savings of $12,000 per year constituted a justifiable "reason[ ] of economy" for abolishing petitioner's teaching position under *N.J.S.A.* 18A:28–9.

In considering these challenges, we are mindful of the appropriate standard of review. In *Dennery v. Board of Education, supra*, 131 *N.J.* 626, 622 *A.*2d 858 this Court stated that, "[it] will not reverse the determination of an administrative agency unless it is arbitrary, capricious, or unreasonable or is not supported by substantial credible evidence in the record as a whole." *Id.* at 641, 622 *A.*2d 858 (citing *Henry v. Rahway State Prison*, 81 *N.J.* 571, 580, 410 *A.*2d 686 (1980)). The Court in *Dennery* noted that it "adhere[s] to that standard to resolve disputes arising under school laws." *Ibid.* (citing *Dore v. Bd. of Educ.*, 185 *N.J.Super.* 447, 452, 449 *A.*2d 547 (App.Div.1982)). *See also Capodilupo v. Bd. of Educ.*, 218 *N.J.Super.* 510, 515, 528 *A.*2d 73 (App.Div.) (holding that final decision of State Board of Education should not be upset unless unreasonable, and unsupported by the record or violative of the legislative will), *certif. denied*, 109 *N.J.* 514, 537 *A.*2d 1300 (1987).

As a tenured teacher, petitioner was entitled to certain statutory protections. *N.J.S.A.* 18A:6–10 provides:

No person shall be dismissed or reduced in compensation,

(a) if he is or shall be under tenure of office, position or employment during good behavior and efficiency in the public school system of the state, . . .

*     *     *     *     *     *     *     *

except for inefficiency, incapacity, unbecoming conduct, or other just cause, and then only after a hearing held pursuant to this subarticle, . . .

Nothing in this section shall prevent the reduction of the number of any such persons holding such offices, positions or employments under the conditions and with the effect provided by law.

■ The tenure statute recognizes certain situations in which school boards may terminate tenured teachers for reasons other than "inefficiency, incapacity, unbecoming conduct, or other just cause." Teaching positions may be abolished for reasons of economy. *N.J.S.A.* 18A:28–9 provides:

Nothing in this title or any other law relating to tenure of service shall be held to limit the right of any board of education to reduce the number of teaching staff members, employed in the district whenever, in the judgment of the board, it is advisable to abolish any such positions for reasons of economy or because of reduction in the number of pupils or of change in the administrative or supervisory organization of the district or for other good cause upon compliance with the provisions of this article.

The Appellate Division pointed out that "[t]he Board's decision to contract with an ESC to provide the speech correction services previously performed by [petitioner] eliminated the need for the position of speech correctionist within the district." 273 *N.J.Super.* at 434, 642 *A.*2d 419. Referring to *N.J.S.A.* 18A:28–9, the court found that the Board, in abolishing petitioner's position within the district, would save the district $12,000 per year, and concluded "that the Board properly abolished [petitioner's] position of speech correctionist 'for reasons of economy' and thus did not violate her tenure rights." *Ibid.*

Our courts have recognized that a local board of education has the authority to reduce its teaching force as long as that reduction is genuinely "for reasons of economy." *E.g., In re Maywood Bd. of Educ.,* 168 *N.J.Super.* 45, 55, 401 *A.*2d 711 (App.Div.) (stating that "[r]eductions in force, whether of tenured or nontenured teachers, if done for reasons of economy, is entirely within the authority of the board."), *certif. denied,* 81 *N.J.* 292, 405 *A.*2d 836

(1979); *see also Jamison v. Morris School Dist. Bd. of Educ.*, 198 *N.J.Super.* 411, 415, 487 *A.*2d 739 (App.Div.1985) (recognizing reduction in force, if done for reasons of economy, is entirely within the authority of the board); *Klinger v. Bd. of Educ.*, 190 *N.J.Super.* 354, 357, 463 *A.*2d 948 (App.Div.1982) ("[R]eduction in force is entirely within the authority of the board if done for reasons of economy."), *certif. denied*, 93 *N.J.* 277, 460 *A.*2d 678 (1983).

■ The determination to reduce the teaching force by abolishing positions need not eliminate the services that may be related to those positions. *E.g., Klinger, supra*, 190 *N.J.Super.* at 357, 463 *A.*2d 948 (concluding that a local school board may alter the full-time status of a tenured employee in order to restructure a department to meet financial constraints while continuing to provide identical services). Whether those services are eliminated, reduced or modified, however, may be a relevant factor in determining whether abolition of a position genuinely advances the goals of economy and efficiency and was undertaken in good faith. *Cf. Viemeister v. Prospect Park Bd. of Educ.*, 5 *N.J.Super.* 215, 218, 68 *A.*2d 768 (App.Div.1949) (stating that the "substance" rather than the form of change controls and if position of "principal" was replaced with identical position with different title, it would not constitute a valid reduction in force); *see also Cochran v. Watchung Hills Regional High School Bd. of Educ.*, 1985 *S.L.D.* 1878 (adopting Commissioner of Education's determination that reduction of child study team from full-time to part-time violated *N.J.S.A.* 18A:28–9 because part-time services would be inadequate, especially in light of then-current statutory requirement that child study team services may only be supplemented) (subsequent history omitted).

In this case, the parties have stipulated that the subcontracting agreement with the ESC for ten hours a week has had "no adverse impact on the program needs of the school district for such speech services." Clearly, the Board's decision to abolish the speech correctionist position held by petitioner, and to contract for

speech correction services with the Monmouth County ESC, has resulted in a more economical delivery of those services in the district. The ALJ determined that the Board's sole motive in contracting with the Monmouth County ESC, and in abolishing petitioner's position, had been to save money. Consequently, the ALJ decided that the Board's action in terminating petitioner was in compliance with *N.J.S.A.* 18A:28–9 and did not violate petitioner's tenure rights. The Commissioner of Education and the State Board of Education also found that the Board's termination of petitioner was in good faith and based on permissible economic interests pursuant to *N.J.S.A.* 18A:28–9. Moreover, there is no indication that the services to be rendered by the ESC are in any way inadequate or do not conform with the standards authorized by the Commissioner. As the Appellate Division explained, petitioner's replacement "involves a statutorily authorized administrative change in the method of providing an educational service for the sole purpose of saving money." 273 *N.J.*Super. at 435, 642 *A.*2d 419.

Finally, we note, the stipulation that the Board "has placed petitioner on a preferred eligibility list for re-employment in her area of seniority." The question whether plaintiff, as a tenured speech correctionist, would have been entitled to preferential hiring by the ESC is not before the Court. *See Shelko v. Bd. of Educ.*, 97 *N.J.* 414, 478 *A.*2d 1187 (1984) (outlining tacking of tenure and rights of teaching staff members when county educational services commission takes over a local special education program from school district).

We conclude, as did the Appellate Division, there exists substantial credible evidence to justify the decisions of the Commissioner and State Board of Education. The Board acted in good faith and complied with *N.J.S.A.* 18A:28–9 in reducing the number of employees within the district for reasons of economy.

## III

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices POLLOCK, O'HERN, GARIBALDI, STEIN, COLEMAN and HANDLER–7.

*Opposed*—None.