708 A.2d 762

IN THE MATTER OF MORRIS SCHOOL DISTRICT BOARD OF EDUCATION, RESPONDENT–APPELLANT, AND APPEAL OF THE EDUCATION ASSOCIATION OF MORRIS, PETITIONER–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 25, 1998—Decided April 22, 1998.

Before Judges BAIME, BROCHIN and WEFING.

*David W. Carroll* argued the cause for appellant (*Carroll & Weiss*, attorneys; *Mr. Carroll* and *James F. Schwerin*, on the brief).

*Gail Oxfeld Kanef* argued the cause for respondent (*Balk, Oxfeld, Mandell & Cohen*, attorneys; *Ms. Kanef*, of counsel and on the brief).

*Don Horowitz*, Deputy General Counsel, argued the cause for the Public Employment Relations Commission (*Robert E. Anderson*, General Counsel; *Mr. Horowitz*, on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

The Morris School District Board of Education (Board) appeals from a scope of negotiation determination by the Public Employment Relations Commission (Commission). The Commission decided that a proposed cap on payments for unused paid sick leave, which retroactively diminished the value of amounts already earned by employees unless they retired within a phased-in grace period, constituted an illegal inducement to early retirement and was thus non-negotiable. The Commission concluded alternatively that the Education Association of Morris (Association) did not knowingly bargain away the accrued sick leave compensation of its members by consenting in advance to be bound by the recommendations of a factfinder, where the retroactive cap was first conceived by the factfinder and had never been proposed by either of the parties. We affirm.

## I.

The Board is a public employer within the purview of the New Jersey Employer–Employee Relations Act (*N.J.S.A.* 34:13A–1 to – 21). The Association is the exclusive collective bargaining representative of the Board's teachers and other non-supervisory employees. The previous collective bargaining agreement expired on June 30, 1995. Upon reaching an impasse in their negotiations, the parties asked the Commission to appoint a factfinder. A factfinder's report is only a recommendation. We are told, however, that parties commonly agree to be bound by the factfinder's decision. In this case, the Association agreed in advance to accept the factfinder's recommendations, but the Board did not consent to be similarly bound.

The expired collective bargaining agreement provided that employees were entitled to accumulated sick leave compensation upon retirement. This fringe benefit has been permitted in the school district for some forty-five years. In its presentation to the factfinder, the Board proposed capping paid leave entitlements or, in the case of employees who had already earned more than that capped amount, freezing their paid leave accounts at present values. The Association proposed to maintain the current benefit with no change. Neither party suggested or argued that any cap would apply retroactively, reducing already earned accumulated sick leave benefits.

In his report, the factfinder characterized as "unusual" the expired collective bargaining agreement's failure to delineate a cap on accumulated sick leave. He recommended that the agreement be modified to cap the amount employees could receive at $25,000 if they retired after July 1, 1997, or at $20,000 if they retired after July 1, 1998. The factfinder proposed that accumulations exceeding the caps be forfeited, but the effective date be delayed "[t]o permit employees who are eligible for compensatory pay [above] the July 1, 1997 cap to retire during the 1996–1997 school year and receive the [higher amount]."

The Board quickly accepted the factfinder's recommendations. The Association brought suit in the Chancery Division, claiming that the cap would unconstitutionally deprive teachers of vested benefits and discriminate against older members. In its pleadings, the Association alleged that sixty to seventy employees would be affected by the caps. Some would lose substantial amounts unless they retired before July 1, 1997. Others who were ineligible to retire would be divested of accumulated sick leave pay exceeding the caps. The Chancery Division dismissed the action on the ground that the Commission had primary jurisdiction concerning whether retroactive application of the caps was outside the scope of negotiations.

The Association then petitioned the Commission for a scope of negotiations determination, seeking both interim and final relief. The Commission's designee stayed the factfinder's proposed caps on accumulated sick leave compensation. He concluded that implementation of the cap beginning July 1, 1997 would constitute an unlawful inducement to retire, thus impairing the actuarial assumptions underlying the teachers' statutorily created pensions. He also found that the Association had not knowingly waived the vested rights of its members to accrued sick leave compensation, because neither party had proposed retroactive application of the cap.

The Commission adopted the designee's findings. In reaching its conclusion, the Commission placed particular emphasis on the "unusual circumstances of this case." The Commission stressed that a party ordinarily may agree to accept a factfinder's report "sight unseen," and that "factfinders and interest arbitrators [commonly] make recommendations and decisions at variance with the parties' proposals on a given subject." The Commission carved out a "limited exception to the validity of [these] practices" because previous collective bargaining agreements had "encouraged employees not to use sick leave and personal days" by entitling them to accumulate and "bank" unused days "for payment upon retirement." The Commission chose not to decide

whether a union could bargain away the accrued wages and benefits of some of its members. Instead, the agency assumed that "already accumulated benefits in retirement bank [could] be reduced through negotiated caps." However, the Commission determined that "there was no knowing waiver in this case since neither party had proposed retroactive caps and [because] the Association voted to accept the factfinder's report before it was issued."

## II.

We first address the Commission's conclusion that the factfinder's proposed cap on accumulated sick leave compensation constituted an illegal inducement to retire. Under the factfinder's plan, eligible teachers could only avoid forfeiting that portion of their accumulated sick leave compensation that exceeded the cap by retiring during the 1996–1997 school year. Citing *Fair Lawn Education Ass'n v. Fair Lawn Board of Education,* 79 *N.J.* 574, 401 *A.*2d 681 (1979), the Commission concluded that the proposal might substantially affect retirement age and impair the fiscal integrity of the teachers' pension plan.

We harbor reservations concerning the Commission's application of the *Fair Lawn* decision. In *Fair Lawn,* our Supreme Court struck down a negotiated early retirement remuneration plan that had been agreed to by the local board and the teachers' union. The plan provided that teachers between the ages of fifty-five and sixty-four who retired early would receive an additional cash payment. *Id.* at 577, 401 *A.*2d 681. The payment was dependent upon age, not years of service, and was structured to provide greater benefits to those retiring at an earlier age. *Ibid.* The principal purpose was to encourage early retirements in order that tenured teachers could be replaced with less experienced instructors whose salary levels would be much lower. *Ibid.* Because an Attorney General's opinion indicated that a similar plan adopted in another district constituted an impermissible modification of the uniform pension plan applicable to teachers, the union

brought a declaratory judgment action. *Id.* at 578, 401 *A.*2d 681. Both the union and the local board contended that the plan was valid. The Teachers' Pension and Annuity Fund (TPAF) was joined as a third party defendant and opposed the plan. A plenary hearing was conducted in which the TPAF presented substantial evidence indicating that if the plan were widely adopted, its pension costs would be "significantly increased." *Ibid.* Uncontradicted evidence was presented that the potential for early retirement under the plan would necessitate an $11,865,-000 increase in the State's annual contribution. *Ibid.*

The Supreme Court concluded that the early retirement plan: "(1) lack[ed] statutory authorization; (2) contravene[d] [settled precedent]; and (3)[was] preempted by the comprehensive statutory scheme relating to the operation of retirement benefits." *Id.* at 576–77, 401 *A.*2d 681. While recognizing that *N.J.S.A.* 18A:27–4 authorizes boards to provide compensation in various forms, the Court held that the statute did not authorize payments for early retirement that were unrelated to years of service. *Id.* at 580, 401 *A.*2d 681. The Court stressed that "the parties to [the] contract intended to reward early retirement rather than the amount and quality of the work that a particular teacher had performed." *Ibid.* Since the payments under the plan were "unrelated to service, [they] [did] not constitute 'compensation' or 'customary fringe benefits' with respect to which negotiation [was deemed] permissible." *Id.* at 581, 401 *A.*2d 681.

Citing the strong evidence presented by the TPAF, the Court also found that the plan had the potential "to undermine the actuarial assumptions upon which the pension scheme was based." *Id.* at 583, 401 *A.*2d 681. In reaching this conclusion, the Court noted that "the probability of such plans being widely copied [was] strong." *Id.* at 584, 401 *A.*2d 681. "Considering that the very purpose of the payments [was] to induce early retirement," the Court emphasized that the effects of the plan could "in no way be deemed incidental." *Id.* at 585, 401 *A.*2d 681. As expressed by the Court, "[g]iven that the sole purpose of the plan—from the

[b]oard's point of view—[was] to induce early retirement, its argument that it will not in fact do so [was] not well taken." *Id.* at 584, 401 *A.*2d 681.

The plan at issue here bears some resemblance to that found unlawful in *Fair Lawn.* However, there are substantial differences. Unlike *Fair Lawn,* the option permitting retirement without application of the cap on sick leave pay provides a benefit that is appropriately keyed to length and quality of service, *i.e.,* those who have been employed in the district the longest with the best attendance records receive the most compensation. Further, the negotiated clause in this case was not designed to encourage or induce early retirement. We note that a plethora of negotiated terms and conditions of employment may have the incidental effect of encouraging eligible teachers to retire. Surely, not every such negotiated condition may be deemed unlawful merely because it may incidentally cause teachers to consider retiring earlier than they might otherwise have chosen. Moreover, we are struck by the absence of any evidence indicating that implementation of the plan might undermine the actuarial assumptions underlying the statutorily created pension plan. It can reasonably be inferred from the factfinder's report that most districts presently apply a cap to sick leave compensation. As we noted, the factfinder characterized the absence of a cap as "unusual." We doubt that the plan would be copied statewide if found to be valid. Consequently, there should be little or no proliferation of effects on the teachers' pension plan from bringing this district into line with others. *See Miller v. Teachers' Pension & Annuity Fund,* 179 *N.J.Super.* 473, 476–77, 432 *A.*2d 560 (App.Div.), *certif. denied,* 88 *N.J.* 502, 443 *A.*2d 714 (1981).

We recognize that the entire subject matter of public employee pensions must be insulated from negotiated agreement which would be inconsistent with comprehensive regulation of that area. Public employees and employee representatives may neither negotiate nor agree upon any proposal that would affect the subject of employee pensions. *See State v. State Supervisory*

*Employees Assoc.,* 78 *N.J.* 54, 83, 393 *A.*2d 233 (1978). However, our concern is that sick leave pay and other forms of deferred compensation have long been considered "additional compensation upon retirement" subject to mandatory negotiation. *See Maywood Educ. Ass'n, Inc. v. Maywood Bd. of Educ.,* 131 *N.J.Super.* 551, 555, 330 *A.*2d 636 (Ch.Div.1974). "[D]ue to the relation of such payments to, and effect upon, statutory pension plans, they must be subjected to careful scrutiny...." *Fair Lawn Educ. Ass'n v. Fair Lawn Bd. of Educ.,* 79 *N.J.* at 587 n. 10, 401 *A.*2d 681; *see also Jacobs v. New Jersey Highway Auth.,* 54 *N.J.* 393, 400–01, 255 *A.*2d 266 (1969). Where it is argued that a negotiated term or condition of employment undermines the actuarial integrity of a pension plan, the issue should be carefully explored by the presentation of evidence. Unfortunately, that was not done in this case, and we are left with a record that is wholly uninformative.

### III.

■ We need not dwell upon the subject. We recognize that in the area of labor-management negotiations parties often agree in advance to accept as binding the recommendations of a factfinder. We also acknowledge that factfinders are generally authorized to innovate and make recommendations that have not been specifically proposed by the parties. We, nevertheless, hold that the Commission had the power to create a limited exception to these practices in cases where the factfinder's recommendation, if implemented, would impair the vested or accrued rights or reasonable expectations of the union's members.

■ We begin with the settled principle that the "judicial capacity to review administrative actions is severely limited." *In re Musick,* 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996). Courts have only a restricted role to play in reviewing the actions of other branches of government. *Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm'n,* 93 *N.J.* 384, 390, 461 *A.*2d 575 (1983). In a variety of contexts, we have said that in cases involving scope of negotiations, the Commission's decision "will stand unless it is

clearly demonstrated to be arbitrary or capricious." *Edison Bd. of Educ. v. Edison Township Principals and Supervisors Ass'n,* 304 *N.J.Super.* 459, 464, 701 *A.*2d 459 (App.Div.1997) (quoting *In re Hunterdon County Bd. of Chosen Freeholders,* 116 *N.J.* 322, 329, 561 *A.*2d 597 (1989)); *see also Impey v. Board of Educ. of the Borough of Shrewsbury,* 142 *N.J.* 388, 397, 662 *A.*2d 960 (1995); *State v. Professional Ass'n of N.J. Dep't of Educ.,* 64 *N.J.* 231, 258–59, 315 *A.*2d 1 (1974). Courts can intervene only in those rare instances in which an agency action is clearly inconsistent with its statutory mission or other state policy. *In re Musick,* 143 *N.J.* at 216, 670 *A.*2d 11.

These well-settled principles have particular pertinence here. Although the parties have couched their arguments in constitutional language, we decide this case on a much narrower ground. While we will refer to the subject later in our opinion, we need not determine whether due process concerns bar a labor union from bargaining away the vested rights of its members. Nor must we decide whether a teacher's accumulated sick leave compensation constitutes an "accrued right," a "vested interest" or a "mere expectancy." These issues have spawned substantial litigation and scholarly comment, but we have no occasion to resolve them in this case. As we perceive it, the narrow question presented is whether the Commission is empowered to adopt procedural rules it believes are necessary to protect the interests of the negotiating parties. So posited, the short answer is that the selection of procedures for the resolution of public sector labor disputes lies at the very heart of the Commission's experience. *Newark Firemen's Mut. Benevolent Ass'n, Local No. 4 v. Newark,* 90 *N.J.* 44, 55, 447 *A.*2d 130 (1982); *State v. Council of N.J. State College Locals,* 153 *N.J.Super.* 91, 93–94, 379 *A.*2d 63 (App.Div.1977), *certif. denied,* 78 *N.J.* 326, 395 *A.*2d 194 (1978).

We add that the Commission's decision comports with common sense and settled precedent. Chapter 30 of Title 18A (*N.J.S.A.* 18A:30–1 to –7) deals with leaves of absences for employees of boards of education. It allows all employees sick leave with full

pay for a minimum of ten school days in any school year. *N.J.S.A.* 18A:30–2. Sick leave is defined as "absence from [work] ... because of personal disability due to illness or injury." *N.J.S.A.* 18A:30–1. The statutes authorize an accumulation of sick leave. *N.J.S.A.* 18A:30–3. Sick leave days not utilized during the year are "accumulative to be used for additional sick times as needed in subsequent years." *Ibid.* We have said that these sections provide only minimum standards and that, unless expressly prohibited, "there is ample room for negotiation on particular matters" relating to sick leave. *Board of Educ. of Piscataway Township v. Piscataway Maintenance & Custodial Assoc.,* 152 *N.J.Super.* 235, 246, 377 *A.*2d 938 (App.Div.1977). In *Maywood Education Ass'n, Inc. v. Maywood Board of Education,* 131 *N.J.Super.* 551, 555, 330 *A.*2d 636, the Chancery Division concluded that a board of education had the power to authorize payment of retirement benefits based on unused sick leave. The court stated that whether and to what extent sick leave compensation is paid upon retirement are matters that are subject to "collective negotiation." *Ibid. Maywood Education Ass'n* has been cited with approval by our Supreme Court, *see Gauer v. Essex County Div. of Welfare,* 108 *N.J.* 140, 150, 528 *A.*2d 1 (1987), and the Board does not contest the fact that sick leave pay may be accumulated and treated as deferred compensation. It is undisputed that the Morris School District has allowed the accumulation of sick leave to be exchanged as deferred compensation upon retirement for at least forty-five years.

In their briefs, the parties have devoted much of their argument to whether teachers' accumulated sick leave constitutes a vested right. The Association contends that to earn the right to deferred payment, teachers presumably refrained from using their paid sick leave and instead performed their jobs when they otherwise could have stayed at home. It is argued that the teacher's right to receive deferred compensation is thus "vested" and cannot be taken away absent their express consent. The Board contends that the teachers had no guaranty their right to fringe benefits would extend beyond the period governed by the previous collec-

tive bargaining agreement. It argues that under prior agreements, retirement was the condition that triggered the right to obtain deferred compensation. The Board thus asserts that absent retirement during the period governed by the previous collective bargaining agreement, the teachers had a mere expectancy that was subject to negotiation.

We think there is no profit in dealing in labels such as "vested right," "accrued interest" or "mere expectancy." None fits precisely, and it would be a mistake to choose one and be driven by the choice to an inevitable consequence. *See Spina v. Consolidated Police and Firemen's Pension Fund Comm'n*, 41 *N.J.* 391, 401, 197 *A.*2d 169 (1964). However the teachers' right to sick leave compensation is phrased, we are satisfied that the Commission's policy barring divestment absent a knowing waiver was reasonable and within its statutory powers.

We note that our Supreme Court has protected similar rights against invasion. In *Gauer v. Essex County Div. of Welfare*, 108 *N.J.* 140, 144, 528 *A.*2d 1, for example, Essex County attempted to discontinue certain health insurance benefits that had been granted to retired welfare workers because other classes of retired employees were not entitled to such benefits and *N.J.S.A.* 40A:10–23 purported to require uniform distribution. The Court prohibited the County from rescinding its policy. In reaching this conclusion, the Court stressed that the retired workers had "served out their employment and retired" relying upon the compensation scheme granting continued health benefits. *Id.* at 147–48, 528 *A.*2d 1.

A similar result was reached in *State Troopers Fraternal Assoc. of New Jersey, Inc. v. New Jersey*, 149 *N.J.* 38, 692 *A.*2d 519 (1997). There, a group of former state troopers sought to recover a retroactive pay adjustment under a collective-negotiations agreement that was reached with the State after the troopers had resigned in good standing. *Id.* at 44, 692 *A.*2d 519. The troopers claimed that, because of an unwritten retroactive past practice of the State Police, the agreement provided for the retroactive pay

adjustment. *Ibid.* During the course of the collective negotiations, the State had adopted a regulation that prohibited retroactive pay increases to all state employees who resigned from state employment before the execution of a collective bargaining agreement. *Ibid.* The Court held that the former troopers were entitled to the retroactive pay increase up to the date the regulation was promulgated. *Id.* at 55–56, 692 *A.*2d 519. This result was said to be mandated because the former troopers had relied on the continuation of the past practice when they decided to resign before the new agreement was signed. *Id.* at 55, 692 *A.*2d 519.

In *Owens v. Press Publishing Co.,* 20 *N.J.* 537, 120 *A.*2d 442 (1956), the Court considered whether the right to severance pay survived the expiration of a collective bargaining agreement. The plaintiffs had been discharged after the collective bargaining agreement had terminated, but claimed that they had earned the right to severance pay as a form of deferred compensation. *Id.* at 542–43, 120 *A.*2d 442. The defendant contended that the plaintiffs' interest in severance pay was not a "vested right" because the plaintiffs had not been discharged during the period covered by the collective bargaining agreement. *Id.* at 543, 120 *A.*2d 442. Characterizing severance pay as "terminal compensation measured by the service given during the subsistence of the contract," *id.* at 545, 120 *A.*2d 442, the Court held that the deferred compensation "was not conditioned upon the employee's discharge from service within the term of the collective bargaining agreement." *Id.* at 548, 120 *A.*2d 442. The Court reasoned that "once the right [came] into being it ... survive[d] the termination of the agreement." *Ibid.* In contrast, the Court concluded that the plaintiffs' claims for severance pay allegedly earned in the intervening period between expiration of the collective bargaining agreement and their respective discharge was "ill-founded." *Id.* at 549, 120 *A.*2d 442. Because the right to severance pay was a creature of the collective bargaining agreement alone, the plaintiffs could not have reasonably relied upon it following expiration of the contract. *Id.* at 551, 120 *A.*2d 442.

While these decisions do not deal with the precise issue presented here, they disclose an underlying concern with the protection of an employee's right to deferred compensation. The Court has recognized that a contract arises and subsists by the consent of the parties, and thus each collective bargaining agreement supplants the preceding one in terms of compensation. However, deferred compensation generally survives expiration of the term of the agreement. In that context, the teachers' right to accumulated sick leave compensation—like the health insurance benefits in *Gauer*, the retroactive pay increase in *State Troopers Fraternal Assoc.*, and the severance pay in *Owens*—in a real sense constituted remuneration for services rendered during the periods covered by the prior collective bargaining agreements and was deserving of special protection.

The Board nevertheless argues that the Association had the right to bargain away the teachers' interest in deferred compensation to promote the common good of its membership. We recognize that budgetary constraints sometimes fuel aggressive management demands for concessions, and unions are thus forced to attempt to equitably distribute to diverse factions, with internally conflicting priorities, the remaining pieces of an ever shrinking pie. *See* Bates, *Benefits of Retirees: Negotiations and the Duty of Fair Representation*, 21 *J. Marshall L.Rev.* 513 (1988). In a variety of factual settings, courts have held that a union has no authority on behalf of its membership to bargain away various forms of deferred compensation earned during the terms of prior collective bargaining agreements absent knowing consent by those who would be adversely affected.

In *Hauser v. Farwell, Ozmun, Kirk & Co.*, 299 *F.Supp.* 387, 388 (D.Minn.1969), former employees of defendant's Metal Fabrication Division brought a class action against their employer and union challenging a collective bargaining agreement eliminating their pension benefits. In upholding the employees' right to damages, the district court reasoned:

> [W]hereas a[u]nion may bargain as to prospective matters such as seniority rights, future conditions of employment, etc., it cannot bargain away the accrued or vested rights of its members. So without explicit authority or a power of attorney from the individual members, the [u]nion in this case could not bargain away the vested rights of its membership, including plaintiffs' vested rights.
>
> [*Id.* at 393.]

*See also Allied Chemical & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.,* 404 *U.S.* 157, 181 n. 20, 92 *S.Ct.* 383, 399 n. 20, 30 *L.Ed.*2d 341, 358 n. 20 (1971); *Elgin, J. & E. Ry. Co. v. Burley,* 325 *U.S.* 711, 738–40, 65 *S.Ct.* 1282, 1297–98, 89 *L.Ed.* 1886, 1902–03 (1945); *Policy v. Powell Pressed Steel Co.,* 770 *F.*2d 609, 613 (6th Cir.1985), *cert. denied,* 475 *U.S.* 1017, 106 *S.Ct.* 1202, 89 *L.Ed.*2d 315 (1986). *But see Turner v. Local Union No. 302, Int'l Bhd. of Teamsters,* 604 *F.*2d 1219, 1225 (9th Cir.1979); *Dwyer v. Climatrol Indus., Inc.,* 544 *F.*2d 307, 310 (7th Cir.1976), *cert. denied,* 430 *U.S.* 932, 97 *S.Ct.* 1553, 51 *L.Ed.*2d 776 (1977); *Gilman v. County of Cheshire,* 126 *N.H.* 445, 448–49, 493 *A.*2d 485, 487–88 (N.H.1985).

In facts strikingly similar to those in this case, the Illinois Appellate Court held that a union could not bargain away the right of an employee to accumulated sick leave compensation granted in prior collective bargaining agreements. In *Lawrence v. Board of Education of School District 189,* 152 *Ill.App.*3d 187, 105 *Ill.Dec.* 195, 197, 503 *N.E.*2d 1201, 1203 (1987), plaintiff, a school attendance officer, brought suit against the Board of Education claiming that he was wrongfully denied payment of sick leave compensation at the time of his retirement. During most of plaintiff's employment, the applicable collective bargaining agreements allowed employees to accumulate sick leave time and receive severance pay upon retirement consisting of a percentage of the accrued compensation. *Ibid.* Prior to plaintiff's retirement, however, the union and the Board entered into a collective bargaining agreement that eliminated the right to receive accumulated sick leave time upon retirement. *Id.* at 198, 503 N.E.2d at 1204. At the time of plaintiff's retirement, he was informed that he would not be receiving his severance pay because it was not permitted under the collective bargaining agreement then in effect. *Ibid.* Plaintiff

was successful at trial, and the Board appealed. As phrased by the court, the question presented was "whether the plaintiff should be entitled to receive compensation for such accumulated sick leave days when at the time of the retirement there were no contractual provisions in the collective bargaining agreement allowing for such payment." *Id.* at 201, 503 N.E.2d at 1207. In affirming the judgment, the court reasoned:

> We conclude that the retirement benefit sought by plaintiff can be characterized as a form of deferred compensation in that plaintiff worked days when he was ill in order to accumulate the sick leave days as a retirement benefit.... [We] find that the 'merit pay' for accumulated sick leave days under the previous terms of the collective bargaining agreements vested upon the date that plaintiff fulfilled the service condition. Once that service condition was fulfilled, the benefit derived from plaintiff's term of service was vested and could only be divested by failure to satisfy the eligibility requirements.
>
> [*Id.* at 203, 503 N.E.2d at 1209 (citation omitted).]

*Cf. E.L. Wiegand Div. v. NLRB,* 650 *F.*2d 463, 468–69 (3d Cir. 1981), *cert. denied,* 455 *U.S.* 939, 102 *S.Ct.* 1429, 71 *L.Ed.*2d 649 (1982); *Knecht v. Board of Trustees for State Colleges and Universities and Northwestern State Univ.,* 591 *So.*2d 690, 695 (La. Sup.Ct.1991); *Matson v. Housing Auth. of Pittsburgh,* 353 *Pa.Super.* 588, 592–93, 510 *A.*2d 819, 821 (Pa.Super.Ct.1986).

Although these decisions are not directly on point, they support the policy adopted by the Commission barring the divestment of accumulated sick leave compensation absent a knowing and intentional waiver by the persons adversely affected. As we noted, the Commission assumed, without deciding, that it might be possible for a majority representative to waive contractually acquired rights to deferred compensation. The Commission nonetheless decided that such reductions or divestment must be entered into knowingly, and that there was no knowing waiver in this case, since neither party had proposed retroactive caps and because the Association had voted to accept the factfinder's report before it issued. We agree with the Commission's conclusion. Both the Association's negotiators and the employees they represented entered into the factfinding proceeding with the reasonable expectation that whatever the new proposal the factfinder might urge,

the right to earned deferred compensation would not be jeopardized. Accordingly, we find no sound basis to disturb the Commission's determination that there was no knowing waiver of the teachers' paid leave banks.

Affirmed.