FAIR LAWN EDUCATION ASSOCIATION, PLAINTIFF-AP-
PELLANT, v. FAIR LAWN BOARD OF EDUCATION, DE-
FENDANT AND THIRD-PARTY PLAINTIFF-RESPON-
DENT, v. TEACHERS' PENSION AND ANNUITY FUND,
DIVISION OF PENSIONS, DEPARTMENT OF TREASURY,
STATE OF NEW JERSEY, THIRD-PARTY DEFENDANT-
RESPONDENT.

Argued February 5, 1979—Decided May 16, 1979.

Mr. *William S. Greenberg* argued the cause for appellant (*Messrs. Greenberg* and *Mellk*, attorneys; *Mr. David Arrajj*, on the brief).

Mr. *Reginald F. Hopkinson* argued the cause for respondent, Fair Lawn Board of Education (*Messrs. Jeffer, Walter, Tierney, De Korte, Hopkinson* and *Vogel*, attorneys).

Mr. *Stacy L. Moore, Jr.*, Deputy Attorney General, argued the cause for respondent, Teachers' Pension and Annuity Fund (*Mr. John J. Degnan*, Attorney General of New Jersey, attorney; *Mr. Stephen Skillman*, Assistant Attorney General, of counsel).

The opinion of the court was delivered by

PASHMAN, J. In this case we are called upon to assess the validity of an Early Retirement Remuneration Plan (ERR) agreed to by the Fair Lawn Board of Education (Board) and the Fair Lawn Education Association (Association) — the majority representative of the Board's teaching employees. For the reasons to be given below, we conclude that the particular plan here at issue: (1) lacks statutory authorization; (2) contravenes this Court's holdings in *Jacobs v. New Jersey Highway Auth.*, 54 N. J. 393 (1969), and *State v. State Supervisory Employees Ass'n*, 78 N. J.

54 (1978); and (3) is preempted by the comprehensive statutory scheme relating to the operation of retirement benefits. Consequently, that plan cannot be implemented.

On July 1, 1976, the Association and the Board entered into a collective agreement covering the 1976–1977 and 1977–1978 school years. Article VI of that agreement set forth the provisions of the ERR plan whose legality is here in dispute. Under the terms of the contract, teachers between the ages of 55 and 64 who retired prior to September 1, 1977 would receive an additional payment in the amount of $6,000 upon leaving the Board's employ.[1] Instructors retiring after the start of the 1977–1978 school year were also entitled to remuneration over and above their normal pension.[2] The value of their benefit, however, was dependent upon age, with those relinquishing their positions at an earlier age receiving a larger bonus. The sums to be paid ranged from $500 for a 64-year-old teacher to $6,000 for retiring instructors aged 55 to 57. Four payment options — including lump sum and various installment alternatives — were provided. The goals underlying the adoption of this plan were twofold: (1) to "reward loyalty and long years of service," and (2) to encourage early retirements in order that tenured teachers could be replaced by younger, less experienced instructors whose salary levels would be much lower.

Pursuant to terms of the ERR plan, twelve members of the Association notified the Board of their intention to retire early. Prior to accepting their resignations, however, the Board informed them that the payments called for by the plan might be unlawful. This conclusion stemmed from the

---

[1] In order to qualify for this bonus, the teacher also had to have been continuously employed by the Board for at least 15 years, and have given written notice of his or her intent to retire before April 1, 1977.

[2] Fifteen years of continuous service and advance notification were also required under this provision.

Board's perusal of an informal opinion rendered by the Attorney General relating to the validity of a somewhat similar plan which had been adopted by the Rumson Board of Education. According to the Attorney General, the Rumson program constituted an impermissible "modification of the comprehensive, uniform scheme established by the Legislature for the pensioning of members of the Teachers' Pension Annuity Fund." The teachers were therefore given the opportunity to rescind their resignations. Several of them did so.

On June 24, 1977, the Association filed suit in the Chancery Division seeking both a declaration that the ERR plan was valid and specific performance of its terms. The Board — named as sole defendant — joined the Teachers' Pension and Annuity Fund (TPAF) as third-party defendant. The pleadings and arguments below demonstrate that of these parties, the Board and the Association are in fact aligned in interest, and that TPAF is the only opponent of the plan.

A plenary hearing was held on July 19, 1977. Two witnesses testified on behalf of TPAF — Donald M. Overholser, a consulting actuary employed by the firm which had helped set up TPAF, and William J. Joseph, the Director of the Division of Pensions (part of the Department of the Treasury).

Overholser testified that if ERR plans were widely adopted and teachers induced to retire earlier than otherwise would have been the case, TPAF costs would be significantly increased. His firm estimated that a one-year reduction in the average age of retirement would necessitate an $11,865,000 increase in the State's annual contributions to the Fund.[3] He admitted that it was impossible to determine prospectively the precise effect this plan would have upon TPAF costs,

---

[3]This figure was submitted by affidavit and was made part of the record after the trial court hearing.

instead noting that only in the long run would the actuarial consequences become fully evident.

Director Joseph agreed with Overholser that a wide-spread trend toward early retirement would increase pension costs. He further opined that the ERR plan would likely have the effect of inducing early retirement, for otherwise it would not have been negotiated.

The trial judge held the plan to be valid. He concluded that the Board possessed the statutory authority to negotiate teachers' salaries and pay them in the form of deferred compensation. Moreover, he concluded that even if the ERR plan would adversely affect the funding of TPAF, the plan was permissible because the decreased costs to the school board resulting from the hiring of lower paid teachers would create a net savings in public expenditures.

The Appellate Division reversed. *Fair Lawn Ed. Ass'n v. Fair Lawn Bd. of Ed.*, 161 *N. J. Super.* 67 (App. Div. 1978). That court, speaking through Judge Michels, held that "the Legislature has not vested [local school boards with] the power to establish supplemental retirement benefits plans or programs for its teachers." *Id.* at 73. Rather, the court noted, the Legislature had preempted the field by providing a comprehensive plan of retirement benefits "meticulous in detail." *Id.* Moreover, the Appellate Division concluded that the plan here at issue would impair the actuarial integrity of TPAF contrary to the mandate of *Jacobs v. New Jersey Highway Auth.*, 54 *N. J.* 393 (1969). We granted the Association's petition for certification. We now affirm.

I.

 Local boards of education are creations of the State and, as such, may exercise only those powers granted to them by the Legislature — either expressly or by necessary or fair implication. *See, e. g., Wagner v. Mayor & Municipal Council of Newark*, 24 *N. J.* 467, 474 (1957); *Botkin v.*

*Borough of Westwood,* 52 *N. J. Super.* 416, 427 (App. Div.), app. dism., 28 *N. J.* 218 (1958); *Belvidere Bd. of Ed. v. Bosco,* 138 *N. J. Super.* 368, 376 (Law Div. 1975). We must therefore determine whether local boards have been delegated the authority to make payments to employees which are unrelated to services rendered for the sole purpose of inducing early retirement.

The trial court held that authorization for the plan could be found in two statutory provisions: *N. J. S. A.* 18A:27–4 (a local board may set the "terms and tenure of employment, * * * salaries and time and mode of payment thereof * * *") and *N. J. S. A.* 34:13A–5.3 (public employers and their employees may negotiate concerning "terms and conditions of employment"). We disagree.

*N. J. S. A.* 18A:27–4 does not confer upon local boards an unlimited power to negotiate all types of financial benefits for their teaching employees. Rather, the statute's use of the word "salaries" indicates that the Legislature intended to grant boards the power to set the "time and mode of payment" only of compensation which bears some relation to the rendition of past or present services. Under the ERR plan here at issue, payments are geared to age, not service. Moreover, the sums to which instructors are entitled decrease as length of service increases. It is thus clear that the parties to this contract intended to reward early retirement rather than the amount and quality of the work that a particular teacher had performed. As such, these payments are not authorized by *N. J. S. A.* 18A:27–4. *Compare Maywood Educ. Ass'n v. Maywood Bd. of Ed.,* 131 *N. J. Super.* 551 (Ch. Div. 1974); *Camden v. Dicks,* 135 *N. J. Super.* 559 (Law Div. 1975); *N. J. Civil Service Ass'n v. Mayor and City of Camden,* 135 *N. J. Super.* 308 (Law Div. 1975).

Nor are the payments called for by the ERR plan authorized by the Employer-Employee Relations Act, *N. J. S. A.* 34:13A–1 *et seq.* That statute does not enlarge the areas in which the Board has been delegated the responsibility

to act. Rather, it merely recognizes the right of public employee representatives to negotiate with the Board over matters which, in the absence of negotiation, could have been set unilaterally by the Board. *See State Supervisory Employees, supra,* 78 *N. J.* at 79. *Cf. N. J. State PBA Local No. 42 v. N. J. State Health Benefits Comm.,* 153 *N. J. Super.* 152 (App. Div. 1977). As such, the provisions of the Employer-Employee Relations Act do not operate to confer authority upon the Board to agree to compensation schemes which bear no relation to the amount and quality of the services which its teaching employees have rendered.

We therefore conclude that the Board has not been delegated the power to agree to or make the payments called for by the ERR plan here at issue. These payments, being unrelated to service, do not constitute "compensation" or "customary fringe benefits" with respect to which negotiation is permissible. See *Bd. of Educ. of Englewood v. Englewood Teachers Ass'n,* 64 *N. J.* 1, 6–7 (1973). Consequently, Article VI of the parties' collective agreement is *ultra vires* and unenforceable.

## II

In *Jacobs v. New Jersey Highway Authority,* 54 *N. J.* 393 (1969), this Court struck down a rule promulgated by the Authority which established a mandatory retirement age of 65. The Public Employees Retirement System (PERS), *N. J. S. A.* 43 :15A–1 *et seq.,* in which the Authority participated, provided for mandatory retirement at 70 and voluntary retirement upon an employee's reaching 60 years of age. *N. J. S. A.* 43 :15A–47. Although the Court could have held the Authority's regulation invalid solely because of its facial conflict with the PERS provision, nevertheless it based its decision on the potential effect of mandatory early retirement upon the actuarial assumptions underlying the statutorily created pension plan. We there stated that if due to the Authority's rule a "substantial group of employees"

retired earlier than they might otherwise have, "the actuarial integrity of the system would suffer an unavoidable trauma, which could only be remedied by substantial additional contributions to the fund by *all* covered employers," 54 *N. J.* at 400 (emphasis in original). This led us to conclude that

> In view of the distortion of the actuarial assumptions that would result from the Authority's * * * rule as well as the resulting insufficiency of its contributions to meet the demands imposed by such a rule * * * such a rule should not be recognized unless authorized expressly or by unavoidable implication of the statute.
>
> [54 *N. J.* at 403]

It is thus manifest that actions taken by a state agency which may substantially affect retirement age and thus the actuarial assumptions of a statutory pension system are impermissible unless clearly and unequivocally authorized by the Legislature.

Although Jacobs did not involve a negotiated clause of a collective agreement, its reasoning is equally applicable in this case. The Employer-Employee Relations Act specifically states that collective agreements may not "annul or modify any pension statute or statutes * * *." *N. J. S. A.* 34:13A–8.1. This express proscription, while not dispositive, demonstrates that the principle enunciated in Jacobs — that the actuarial integrity of a state pension plan is not subject to local tinkering — is applicable when public sector agreements are involved.

We expressed overriding concern for the fiscal health of TPAF in *State v. State Supervisory Employees Ass'n, supra,* where, while upholding the right of public employees to negotiate concerning the "terms and conditions" of employment generally, we stressed that the right to negotiate does not apply to the area of retirement benefits. Specifically, we concluded that

> The Legislature has determined that the entire subject matter of public employee pensions is to be insulated from negotiated agreement which would contravene or supplement its comprehensive regu-

lation of that area. Public employees and employee representatives may neither negotiate nor agree upon any proposal which would affect the sacrosanct subject of employee pensions.

[78 *N. J.* at 83]

The validity of Article VI of the negotiated agreement must be measured against the benchmarks established by *Jacobs* and *State Supervisory Employees.* Under this test it is clear that the provision must fail.

As a preliminary observation, we note that any distinction between this case and *Jacobs* based on the ground that *Jacobs* involved forced early retirement, whereas this matter involves only induced early retirement, is untenable. As discussed above, the true *ratio decidendi* of that case was the potential of the Authority's plan to undermine the actuarial assumptions upon which the pension scheme was based. Impact depends solely upon whether employees do, in fact, retire early. That such a result is accomplished by economic inducement rather than fiat is of no consequence.

The potential impact of ERR plans upon TPAF is substantial. Donald M. Overholser, an expert actuary, testified that if such plans became widespread and teachers were induced to retire early, State contributions to the Fund would have to be significantly increased. Indeed, a report prepared by Mr. Overholser's firm estimated that a decrease of only one year in average retirement age would increase annual State contributions by nearly $12,000,000.

The Board and Association contend, however, that counsel for TPAF has failed to demonstrate that the ERR plan will in fact either (1) be widely adopted or (2) actually induce early retirement. In the context of this case, such contentions are unavailing.

To hold that local boards are empowered to negotiate ERR agreements merely because some may refrain from so doing would involve, to say the least, rather peculiar logic. Moreover, such a conclusion would be directly contrary to *Jacobs,* where we held the Authority's rule invalid despite the

absence of any proof that other agencies would impose such mandatory retirement regulations. Instead, we emphasized the potential harm that might occur were substantial numbers of employees subjected to early retirement. 54 *N. J.* at 400.

More importantly, the probability of such plans being widely copied is strong. By adopting an ERR plan, a local board of education induces teachers to opt for early retirement, thus allowing their replacement by less-experienced, lower-paid teachers. Consequently, educational expenses within the school district are diminished. This in fact is the Board's admitted reason for negotiating the plan at issue. By so doing, however, the local board increases TPAF costs. Inasmuch as these expenses are borne by the State as a whole, a shifting of costs from the local school district to the State will be accomplished. Thus, local boards will logically be eager to adopt ERR plans.[4] Moreover, if one school district establishes such a plan, neighboring districts will be impelled to adopt similar plans as a competitive measure. *Cf. Switz v. Middletown Tp.,* 23 *N. J.* 580, 600 (1957) (Weintraub, J., concurring).

The contention that TPAF has failed to prove that ERR plans actually induce early retirement must also, under the circumstances, be rejected. Given that the sole purpose of the plan — from the Board's point of view — is to induce early retirement, its argument that it will not in fact do so is not well taken.

The tendency of the plan to induce early retirement is clear. Only a rudimentary knowledge of economics is necessary to comprehend that the widespread grant of economic incentives to retire will, in the long run, induce early retire-

---

[4]This represents an application of the well-known principle of adverse selection, which, in general terms, states that insureds, given a freedom of choice, will adopt a course of action least favorable to the insurer.

ment by reducing the costs of leaving work.[5] That the ultimate effect of a particular plan is not presently capable of quantification is no bar to relief. Considering the potential fiscal consequences to the Fund, it would be unwise to require TPAF to wait until the injurious effect became apparent before seeking judicial invalidation. By that time, much of the damage would already have occurred.

The Board makes a more sophisticated, albeit similar, argument. It concedes that the ERR plan may induce early retirement, but contends that it does so merely by encouraging teachers to exercise an option granted them by statute. The Board notes that numerous factors may influence a teacher's retirement decision[6] and asserts that it is the responsibility of TPAF to adjust its actuarial assumptions to account for such effects. It characterizes the effects of the ERR plan as "incidental and nebulous," and stridently insists that the TPAF is not entitled to a "pristine existence" in an actuarial "fairyland."

Although it is true that any pension plan is subject to a myriad of individual considerations which may affect its actuarial base, this does not justify the ERR plan at issue. The critical flaw in the Board's argument is the assumption that the effects of this plan are merely "incidental and nebulous." Considering that the very purpose of the payments is to induce early retirement, the effects of the ERR plan can in no way be deemed incidental. Further, as previously discussed, the potential harm attributable to such plans is substantial. Thus, the Board's argument must fail.

---

[5]This conclusion is compatible with studies in the automobile industry, cited by Mr. Overholser at plenary hearing, which show that retirement benefits do tend to reduce average retirement age.

[6]Such factors may include, for example, salary and fringe benefit levels, teaching methods and materials, curriculum changes, physical condition and location of the school and imposition of extra duties. Moreover, actuarial assumptions are subject to changes due to varying life expectancies and general social conditions.

For the foregoing reasons we conclude that the ERR plan here involved contravenes the principles enunciated in *Jacobs* and elaborated upon in *State v. State Supervisory Employees Ass'n, supra.* Thus, even apart from the issue of the Board's statutory authority to make such payments, the plan must be held invalid.

## III

█ It is axiomatic that a municipality may not act in an area which the Legislature has preempted. *See, e. g., Overlook Terr. Manag. Corp. v. Rent Control Bd. of W. New York,* 71 *N. J.* 451 (1976); *Summer v. Teaneck,* 53 *N. J.* 548 (1969). In deciding whether a particular municipal activity has been preempted, the Court must determine whether the Legislature intended its action to preclude the exercise of local authority. *See Summer v. Teaneck, supra,* 53 *N. J.* at 554–555. In the context of this case, we must therefore inquire whether the Legislature, by enacting TPAF, intended to prohibit the adoption of ERR plans such as the one at issue.

█ In assessing the legislative intent, the primary factor to be considered is whether the municipal action adversely affects the legislative scheme. *See, e. g., Overlook Terr. Manag. Corp., supra.* Without detailing the specific criteria carefully enumerated by Justice Schreiber in that opinion, it is clear that the instant plan cannot stand. Its adverse effect upon the comprehensive legislative scheme[7] has been fully documented in Part II ante.[8] Hence, its existence stands " 'as an obstacle to the accomplishment and

---

[7] *N. J. S. A.* 18A:66–1 *et seq.,* the Teachers' Pension and Annuity Fund — Social Security Integration Law, has almost 200 separate sections and covers the teachers' pension system in minute detail.

[8] Indeed, one might well argue that *Jacobs* and *State Supervisory Employees Ass'n, supra,* actually represent particular applications of the preemption doctrine.

execution of the full purposes and objectives' of the Legislature[.]" *Overlook Terr. Manag. Corp. v. Rent Control Bd. of W. New York, supra,* 71 N. J. at 462 (quoting from *Hines v. Davidowitz,* 312 U. S. 52, 67–68, 61 S. Ct. 399, 404, 85 L. Ed. 581, 587 (1971)).

The Association attempts to avoid application of the preemption doctrine by making a semantic argument that ERR payments are not pensions and hence not prohibited. This contention ignores both the breadth of the statute, which regulates a number of retirement benefits in addition to pensions,[9] and the fact that for preemption to occur it is necessary only that the municipal action occur in an area sufficiently affecting the State scheme that a legislative intent to foreclose such action can be discerned. *See Overlook Terrace, supra,* 71 N. J. at 461. This effect has already been amply discussed.

## Conclusion

For the reasons explicated above, we conclude that local school boards are without power to authorize the payment of non-service related retirement benefits such as those in issue.[10] Moreover, such plans contravene the principles of *Jacobs* and *State Supervisory Employees Ass'n* and have been preempted by the Legislature.

Although we are not unsympathetic to the desire of local boards of education to reduce their expenses, sanction for plans such as the one at issue must come from the Legislature.

---

[9]For example, the statute covers such matters as: life insurance, N. J. S. A. 18A:66-38, -53; accidental death benefits, N. J. S. A. 18A:66-46; and loans from contributions to the pension fund, N. J. S. A. 18A:66-35.

[10]We here express no opinion as to the validity of other forms of deferred compensation. However, we note that due to the relation of such payments to, and effect upon, statutory pension plans, they must be subjected to careful scrutiny to ensure that the Fund will not be endangered thereby.

That branch of government has determined that preservation of the TPAF's fiscal integrity is presently to be accorded paramount concern. We are not at liberty to reassess the policy judgment which it has made. Absent clear and unequivocal statutory authority, ERR plans such as Fair Lawn's may not be established.

Accordingly, the judgment of the Appellate Division is affirmed.

SCHREIBER, J., concurring. I concur in Justice Pashman's opinion. However, I do have some reservations concerning the rationale of *Jacobs v. New Jersey State Highway Authority*, 54 *N. J.* 393 (1969). There the Highway Authority voluntarily joined the Public Employees Retirement System (PERS), *N. J. S. A.* 43 :15A–1 *et seq.*, so that the Authority's employees were brought within the pension plan provisions of PERS. Under the PERS act, mandatory retirement was set at age 70. However, the Authority by regulation fixed mandatory retirement at age 65.

This Court, finding no language in the act creating the Authority which authorized it to prescribe a retirement age, reasoned that the Legislature had been moving toward a uniform scheme in PERS for pensioning public employees in state and local government service. To permit the Authority to prescribe different qualifications would contravene that scheme. It also pointed out that a major element of the pension system was the general specification of the voluntary and mandatory age requirements in the PERS act, *N. J. S. A.* 43 :15A–47 (a) and (b). 54 *N. J.* at 404. It buttressed this position because of the financial impact on the pension fund since contribution to the fund had been predicated upon actuarial assumptions utilizing a mandatory retirement age of 70. *Id.*

It does not necessarily follow, as the *Jacobs* opinion may be said to imply, that simply because a change in a term or condition of employment may have a substantial impact on the pension fund that such a change may not be made

without violating *N. J. S. A.* 34:13A–8.1 which provides that no provisions of the New Jersey Employer-Employee Relations Act shall "annul or modify any pension statute or statutes of this State." The proper focus of issues of this type should be directed to what constitutes a pension, rather than the impact on the fund.

SCHREIBER, J., concurring in the result.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.