774 A.2d 680 (2001)
340 N.J. Super. 473
FRATERNAL ORDER OF POLICE, Garden State Lodge # 3, Robert J. Brandt, Thomas Piccinini, William Smith, David Wilkers, Charles Wheeler, Michael Lipka, Benjamin Blaszkowski, Craig Morris and Richard McKean, Petitioners-Appellants,
v.
BOARD OF TRUSTEES of the POLICE AND FIREMEN'S RETIREMENT SYSTEM, Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 16, 2001.
Decided June 1, 2001.
*681 James Katz, Cherry Hill, argued the cause for appellants (Sagot, Jennings & Sigmond, attorneys; Mr. Katz, on the brief).
Michael Lombardi, Assistant Deputy Attorney General, argued the cause for respondent (Peter A. Garcia, Acting Public Defender, attorney; Mr. Lombardi, on the brief).
Before Judges COBURN, LEFELT and AXELRAD.
The opinion of the court was delivered by COBURN, J.A.D.
This is an appeal from a final administrative determination by the Board of *682 Trustees of the Police and Firemen's Retirement System. The appellants, Pennsauken police officers and their union, initiated these proceedings because the Board adopted a new regulation defining in greater detail the forms of compensation not subject to pension contributions and not creditable for retirement and death benefits. The appellants recognized that the regulation cast doubt on a prior ruling they had obtained from the Board. That ruling approved as creditable a negotiated salary increase for officers with twenty-two years of service that was given in exchange for the waiver of other compensation, not subject to pension contributions, received by the officers during their prior years of service. On this occasion, applying the new regulation, the Board ruled that the increase was extra compensation granted primarily in anticipation of retirement and therefore not creditable. Appellants appeal, and we affirm.
The relevant facts are not in dispute. In 1986, the Superior Officers Association ("SOA"), a subgroup of appellant Fraternal Order of Police, Garden State Lodge # 3 ("FOP"), obtained the pay step in question for its members during negotiations with the Township of Pennsauken. In 1989, the FOP obtained the increment for Patrol Officers and Detectives. The increment, referred to as "senior status" has been incorporated in substantially similar form in all subsequent contracts negotiated by these parties.
The contracts list the base salaries for officers in a given title for each of the contract years covered by the agreement. The basic titles in the SOA agreements were Sergeant, Lieutenant, and Captain. Initially, the FOP agreements showed salaries for Detectives and for Patrolman positions with one, two, and three years of experience. Beginning in 1994, the FOP agreement included another position, Cadet, for officers still undergoing Police Academy training, and expanded the Patrolman pay schedule to eight steps, so that the upper level of pay (excluding "senior status") was not reached until the eighth year of employment instead of the third. That agreement also eliminated the earlier agreements' distinctions between Senior Patrolman and Senior Detective, creating instead a combined Senior Officer category, receiving the higher pay level that the Senior Detective title had carried. The current FOP agreement continued the scheme of eight steps of Patrolman salaries, plus higher salaries for Detectives and Senior Officer.
The agreements also provided that "all Police Officers, upon completion of twenty-two (22) years of service as a Police Officer, shall attain the position of" either "Senior Patrolman, or Senior Detective depending upon their assignment" and that superior officers would be called "Senior Sergeant, Senior Lieutenant, or Senior Captain, depending upon their rank."
In the SOA agreement, salaries for the contract years were shown for the Sergeant, Lieutenant, and Captain positions, and for the Senior Sergeant, Senior Lieutenant, and Senior Captain positions. The salary differences between the listed salaries for the "Senior" and "non-Senior" versions of each rank for the last year of the SOA 1998-2001 agreement are as follows: $11,893 difference between Senior Sergeant ($80,566) and Sergeant ($68,673); $12,884 difference between Senior Lieutenant ($88,022) and Lieutenant ($75,138); and $13,878 difference between Senior Captain ($93,161) and Captain ($79,283).
Similarly, in the most recent FOP agreement, salaries for 1997 through 2001 were shown for the Patrolman, Detective and Senior Officer positions. For 2001, the top rate, eighth step Patrolman salary was $56,626, and the Detective salary was *683 $61,169. Compared to the $71,704 Senior Officer salary, these salaries were less by $15,078 and $10,535, respectively.
Under both SOA and FOP agreements, officers also received longevity pay, compensable at the following rates: 3% for years five through nine; 4% for years ten through fourteen; 5% for years fifteen through nineteen; 6% for years twenty through twenty-two. After twenty-two years of service, the police officer would no longer receive longevity pay.
Additionally, under both SOA and FOP agreements, officers received annual vacation leave, allocated at the following annual amounts: fifteen days for the first year; seventeen days for years two through four; twenty days for years five through nine; twenty-three days for years ten through fourteen; twenty-six days for years fifteen through nineteen; twenty-nine days for years twenty through twenty-two. After twenty-two years of service, the police officer would no longer receive any additional vacation days. Police officers were permitted to "sell back" unused vacation days for additional pay each year, subject to certain restrictions. Longevity pay and pay for selling back leave were distributed to officers in a separate check each year in early December. Neither was subject to pension contributions.
In his letter of July 25, 1997, addressed to the Board, the township administrator explained the background leading to the creation of the concept of "senior status," clearly indicating the link between it and the waiver of the non-pensionable forms of compensation paid during an officer's first twenty-two years of service:
The Township of Pennsauken and the Superior Officers Association during labor negotiations for the contract beginning July 1, 1986 reached an agreement providing for an additional pay step when an officer completes his 22nd year. The Township, in agreeing to this additional pay step back in 1986, negotiated a concession from the officers that at the time of this step increase they would no longer be eligible for or receive longevity pay or receive vacation days or compensation for non use of same. For lack of a better word, the Township and the S.O.A. agreed to calling this step increase Senior Officer status. As is off-times [sic] the case, when the F.O.P. began their labor negotiations with the Township of Pennsauken for a contract beginning July 1, 1989 also placed on the table was a request to receive Senior Officer status under identical terms and conditions as the Superior Officers had received in their contract. The Township of Pennsauken in consideration of other concessions and economic advantage to the Township agreed to this item as one of the negotiated positions that ultimately lead to ratification of the F.O.P. contract effective July 1, 1989. That language has existed in both the S.O.A. contracts and the F.O.P. contracts ever since.
[Emphasis added.]
On September 17, 1997, in response to that letter, the Board indicated that it "is now satisfied that the Township of Pennsauken is in total compliance with the New Jersey Statutes and Administrative Code governing creditable salary."
In February 2000, the Board amended the applicable regulation, thereby precipitating the appellants' request for a ruling acknowledging the "senior status" increments as pensionable.[1] Reversing the position *684 previously taken, the Board issued a final administrative determination, which, in relevant part, states the following:
Following its review, it was the Board's determination to deny Senior Officer pay as creditable for pension purposes. The Board considered the fact that in the 22nd year of service a member is unable to accumulate any additional vacation and also loses longevity pay, which until that point was paid in lump sum. The Board noted the contract calls for the creation a Senior Officer salary classification for those who have completed 22 years of service. The Board finds this step increase in salary in conjunction with the loss of benefits simultaneously occurring in the 22nd year in violation of N.J.A.C. 17:4-4.1(a)2vi, which is cited below:
Sell-backs, trade-ins, waivers, or voluntary returns of accumulated sick leave, holiday pay, vacation, overtime, compensatory time, or any other payment or benefit in return for an increase in base salary;
However, the Board considered the fact that it had previously reviewed this matter in 1997, prior to the adoption of the revised rule on creditable compensation, and approved this Agreement. In light of that fact, the Board does not intend to act contrary to advice given in 1997 until the expiration of the "grandfather" period set forth in N.J.A.C. 17:4-4.1(i). Therefore, Pennsauken may consider the provisions of this contract valid until a new contract is negotiated or December 31, 2001, whichever occurs first.
The appellants contend that the Board's determination is contrary to the applicable statute, inconsistent with its own regulation, and arbitrary. Alternatively, they argue that the Board should be estopped from enforcing the regulation as to them because of its prior decision approving the "senior status" pay raise as pensionable. More specifically, they argue that "senior status" pay meets the requirements of the statute and regulation because it is part of an established policy for all employees in the same position and does not include an individual salary adjustment granted primarily in anticipation of a member's retirement. They also argue that the Board inappropriately presumed that there was a quid pro quo because the creation of "senior status" occurred in the same negotiation as changes in longevity pay and vacation pay. We reject these arguments as unsound.
Once an administrative agency has issued a final decision, our review is quite circumscribed. In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587, 538 A.2d 794 (1988)). The scope of review is restricted to four inquiries:
(1) whether the agency's decision offends the State or Federal Constitution;
(2) whether the agency's action violates express or implied legislative policies;
(3) whether the record contains substantial evidence to support the findings on which the agency based its action; and
(4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[Ibid. (quoting Brady v. Board of Review, 152 N.J. 197, 210-11, 704 A.2d 547 (1997)).]
Generally, pension statutes should be liberally construed in favor of the public employees intended to be benefitted thereby. Steinmann v. State, Dept. of Treasury, 116 N.J. 564, 572, 562 A.2d 791 (1989). Nevertheless, "such construction `should not obscure or override considerations of ... a potential adverse impact *685 on the financial integrity of the [f]und.'" Kramer v. Board of Trustees of Pub. Employees' Ret. Sys., 291 N.J.Super. 46, 54, 676 A.2d 1117 (App.Div.1996), certif. denied, 148 N.J. 458, 690 A.2d 606 (1997) (quoting Chaleff v. Bd. of Trustees, Teachers' Pension & Annuity Fund, 188 N.J.Super. 194, 197, 457 A.2d 33 (App. Div.), certif. denied, 94 N.J. 573, 468 A.2d 215 (1983)). Moreover, the principle that "the actuarial integrity of a state pension plan is not subject to local tinkering" has been held applicable to public sector collective bargaining agreements. Fair Lawn Educ. Ass'n v. Fair Lawn Bd. of Educ., 79 N.J. 574, 582, 401 A.2d 681 (1979). Thus, the Fair Lawn Court struck down a provision in a collective bargaining agreement between a local school board and the teachers' union that would have granted bonuses to teachers who chose to retire early. Id. at 576-77, 401 A.2d 681. The Court emphasized the potential impact on the pension plan if such bonus plans were widely adopted, noting that the ability to reduce local school district costs by increasing State pension plan costs would be equally appealing to other local boards. Id. at 583-84, 401 A.2d 681.
The pension system at issue here is governed by N.J.S.A. 43:16A-1 to -68. That law's definitions section provides:
"Compensation" shall mean the base salary, for services as a member as defined in this act, which is in accordance with established salary policies of the member's employer for all employees in the same position but shall not include individual salary adjustments which are granted primarily in anticipation of the member's retirement or additional remuneration for performing temporary duties beyond the regular workday.

[N.J.S.A. 43:16A-1(26).]
In Wilson v. Board of Trustees of Police and Firemen's Ret. Sys., 322 N.J.Super. 477, 731 A.2d 513 (App.Div.1998), we reviewed the Board's decision not to include longevity pay as compensation under this statute. The ordinance and contract at issue provided that police officers could opt to include longevity pay in their bi-weekly salary payments after completing twenty years of public employment. Id. at 479-80, 731 A.2d 513. We held that this salary structure
improperly attempts, based on the employee's years of service, to increase the employer's established salary. While the twenty-year distinction is phrased in general terms and applies to all employees with twenty or more years of service, its application to individual retirees reveals that the twenty-year option is an individual salary adjustment granted primarily in anticipation of retirement.
[Id. at 481, 731 A.2d 513.]
We recognized that the type of compensation excluded pursuant to the statute "is not limited to salary increases granted in the year immediately preceding retirement." Id. at 482, 731 A.2d 513. We said, "the twenty-year longevity payment option cannot transform an otherwise impermissible lump sum longevity payment into pensionable salary merely by making the same total dollar figure paid periodically in the employee's bi-weekly paycheck rather than in one check at the end of the year." Id. at 482-83, 731 A.2d 513. Furthermore, we noted that the approach at issue "deprives the pension fund of both employer and employee contributions on longevity payments for at least a twenty-year period." Id. at 483, 731 A.2d 513. We also observed that while this produces "substantial cost savings to the employer and the employee" during that period, "the fund will receive employer and employee contributions for only a limited number of years prior to the employee's retirement, thereby disrupting the funding mechanism *686 and the actuarial soundness of the pension system." Ibid.
We expanded on that subject with the following thoughts:
Exclusion of the type of longevity payments from an employee's base salary for the purpose of calculating pension benefits promotes consistency and predictability in the collection of contributions and payments of benefits. Utilizing uniform base salaries enables the actuary of the fund to predict with greater precision the amount of monies necessary to fund benefits and to adjust contribution rates in order to maintain the stability and sufficiency of available fund assets. The soundness of a fund is directly related to the certainty and predictability of past transactions from which certain assumptions are derived. Not only can the fund not predict whether an employee will or will not choose to exercise the option to receive longevity payments in his salary shortly before retirement, but a pension calculated on these payments that have been unfunded for a minimum of twenty years can only threaten the actuarial soundness of the fund.
[Id. at 484, 731 A.2d 513.]
Our analysis in Wilson fully supports the Board's decision in the present case. The Board reviewed the terms of the 1986-1989 SOA agreement, and noted the congruence of three compensation items occurring after employees completed twenty-two years of service: increased "base salary" in the "senior status"; cessation of longevity pay, previously a lump sum, non-creditable amount; and cessation of vacation day accruals, which previously could be cashed in for a lump sum, non-creditable amount. Much like the plan held non-creditable by the Wilson decision, the Pennsauken approach tries to transform "an otherwise impermissible lump sum longevity payment into pensionable salary," thereby similarly depriving the pension system of employer and employee contributions on that additional amount newly included as salary. See 322 N.J.Super. at 482-83, 731 A.2d 513.
Appellants assert that the Wilson decision supports their position, because they contend it was "critical" to the Wilson holding that including longevity pay into base pay occurred at the employee's option. Nothing in the opinion states that this option was the decisive factor, nor should it be. By inflating salaries late in the career, the two schemes are both disruptive to the actuarial soundness of the pension system. Under the Wilson facts, increases would occur only for those who opted for them, although it can be expected that many would have selected this option. Under Pennsauken's scheme, all of the officers' salaries would dramatically increase soon before retirement. Thus, the Pennsauken system's uniform approach was more certain to be disruptive to the pension system's actuarial soundness, and the Wilson decision's holding is equally applicable.
Of course, as appellants note, there are some entirely legal ways in which final salaries may vastly exceed base salaries upon which past contributions were made. In December 1998, the State Commission on Investigation issued its report on Pension and Benefit Abuses, discussing both legal and illegal manipulations of salaries for pension purposes. The report noted that the Public Employees Retirement System (PERS) credits every year of employment equally when calculating pension credit, so that a person who worked part-time at an annual salary of $1500 for many years and then served three years at a higher-paying full-time job would have the total number of years counted for pension credit based upon the *687 "final average salary" at the higher level, resulting in a pension benefit that "may be grossly disproportionate to the contributions that have been made on the recipient's behalf and can constitute a drain on the assets of the pension fund". This anomaly, however, does not mean that pension funds must forego all other attempts to maintain actuarial soundness. The Wilson rationale is consistent with the system's overall structure of contributions throughout a career supporting the pension benefit payments upon retirement. The Board is justified in upholding that structure whenever the Board's statutory parameters will allow that course.
Appellants assert that the rationale for creation of the "senior status" was "no different than any other pay step" and "reflects the officer's experience and contribution to the force." Notably, all of the other pay steps for Pennsauken officers occurred annually over the course of three years initially, later extended to eight years, but in either case the increases occurred early in the officers' careers. There were also regular increases in longevity pay and vacation day accruals that continued up to the officers' twenty-second year, and presumably these also reflected an officer's experience and contribution to the force. The simultaneous end of those longevity pay and vacation day accruals when the "senior status" salary increase took place made it appear that the only purpose was to shift dollars into base pay late in the officer's career to boost pension payments upon the officer's retirement.
Certainly the municipality could have had a different pay structure with the same total dollar amounts of officer pay, in which all compensation could have been paid in the form of steady, ever-increasing salary amounts throughout the officers' careers, even beyond the twenty-fifth year, without ever paying a separate non-creditable longevity component. This approach would have drawn no inquiry regarding pension credit, but it also would have required additional pension contributions from the employer and employee throughout the officers' careers. It was the shift of dollars from non-base to base pay categories late in the officers' careers that conflicted with the statute's limitation of creditable compensation.
There is no merit to appellants' assertions that the present matter is contrary to the PERS regulation upon which the decision rests. The Board reached the quite logical conclusion that the increased salary in "senior status" was related to the simultaneous end of longevity benefits and vacation accruals. Thus, the Board determined that this amounted to "voluntary returns" of a "payment or benefit in return for an increase in base salary," which the Board had declared to be non-creditable "extra compensation" under N.J.A.C. 17:4-4.1(a)(2)(vi). The result is therefore a sound application of the regulation.
Appellants contend that the Board should be estopped from disapproving "senior status" pay as creditable for pension purposes, because it previously approved it on two separate occasions, in 1990 and 1997. Individual officers relied upon this pay as an inducement to remain employed, and other economic concessions were negotiated based upon continued receipt of "senior status" pay.
The Supreme Court has defined the doctrine of equitable estoppel as follows:
The essential principle of the policy of estoppel here invoked is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct. An estoppel... may arise by silence or omission where one is under a duty to speak or *688 act. It has to do with the inducement of conduct to action or nonaction. One's act or acceptance may close his mouth to allege or prove the truth. The doing or forbearing to do an act induced by the conduct of another may work an estoppel to avoid wrong or injury ensuing from reasonable reliance upon such conduct. The repudiation of one's act done or position assumed is not permissible where that course would work injustice to another who, having the right to do so, has relied thereon.
[Summer Cottagers' Ass'n of Cape May v. City of Cape May, 19 N.J. 493, 503-04, 117 A.2d 585 (1955) (citations omitted).]
In Middletown Tp. Policemen's Benevolent Ass'n Local 124 v. Township of Middletown, 162 N.J. 361, 367, 744 A.2d 649 (2000) (quoting Gruber v. Mayor and Township Comm. of Raritan, 39 N.J. 1, 13, 186 A.2d 489 (1962)), the Court noted that equitable estoppel "may be invoked against a municipality `where interests of justice, morality and common fairness clearly dictate that course.'" The Court noted further that equitable estoppel, though rarely invoked against a governmental entity, would be "applied in the appropriate circumstances unless the application would `prejudice essential governmental functions.'" Id. at 367, 744 A.2d 649 (quoting Vogt v. Borough of Belmar, 14 N.J. 195, 101 A.2d 849 (1954)).
The Middletown Court reviewed the analysis, developed in Skulski v. Nolan, 68 N.J. 179, 198, 343 A.2d 721 (1975), regarding whether the governmental action at issue was ultra vires in the primary sense or the secondary sense. Middletown, 162 N.J. at 368, 744 A.2d 649. The Skulski Court had observed:
There is a distinction between an act utterly beyond the jurisdiction of a municipal corporation and the irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional. The former are ultra vires in the primary sense and void; the latter, ultra vires only in a secondary sense which does not preclude ratification or the application of the doctrine of estoppel in the interest of equity and essential justice.
[Skulski, 68 N.J. at 198, 343 A.2d 721 (quoting Gruber, 39 N.J. at 19, 186 A.2d 489).]
The Middletown Court reaffirmed that actions that are ultra vires in the secondary sense would permit the application of estoppel. Middletown, 162 N.J. at 368, 744 A.2d 649. Because statutes provided for municipalities to extend health benefits to their retired employees, but not in the manner in which benefits were granted to the individual plaintiff in the Middletown case, the Court held that the action was ultra vires in the secondary sense. Id. at 369-71, 744 A.2d 649. The Court further held that "[a] municipality will be equitably estopped from terminating benefits that were previously approved and relied upon by the recipient." Id. at 372, 744 A.2d 649. Because the plaintiff had retired based on promises that he would receive post-retirement health benefits, and then he received the benefits for ten years before their provision was challenged by a third party, the municipality was equitably estopped from terminating the plaintiff's health benefits. Id. at 372-73, 744 A.2d 649.
The Middletown Court also distinguished Wolfersberger v. Borough of Point Pleasant Beach, 305 N.J.Super. 446, 702 A.2d 1294 (App.Div.1996), aff'd, 152 N.J. 40, 702 A.2d 1284 (1997). Middletown, 162 N.J. at 374, 744 A.2d 649. The Court found that "that case lacks the critical element of reliance. Wolfersberger applied for benefits and was properly denied them. Unlike [the Middletown plaintiff], *689 Wolfersberger never received benefits, and therefore he could not allege a claim of reliance. Accordingly, the principle of estoppel could not be applied." Ibid.
Under facts similar to those in the Middletown case, in Wood v. Borough of Wildwood Crest, 319 N.J.Super. 650, 653-55, 726 A.2d 310 (App.Div.1999), the plaintiff had retired in January 1993 and received health benefits through February 1996, at which point the municipality reviewed the matter based upon a statutory amendment and determined that the benefits had been improperly granted. The plaintiff had worked for twenty-two-and-a-half years, but purchased service credit to accumulate twenty-five years of credit prior to retirement, and upon his inquiries the municipality had given the plaintiff numerous assurances that he would receive health benefits upon retirement. Ibid. Under these circumstances the municipality's action was considered ultra vires in the secondary sense, and the municipality was estopped from terminating health benefits to the plaintiff. Id. at 660-61, 726 A.2d 310.
In Miller v. Bd. of Trustees of Teachers' Pension & Annuity Fund, 179 N.J.Super. 473, 474-75, 432 A.2d 560 (App.Div.), certif. denied, 88 N.J. 502, 443 A.2d 714 (1981), the petitioners were eight retired teachers who had been receiving pension benefits from the Teachers' Pension & Annuity Fund (TPAF) from dates ranging from July 1971 to July 1977. Two were just under sixty years old when they retired; the others were well into their sixties at retirement. Id. at 475, 432 A.2d 560. All eight received an order from TPAF that their salary credits, and therefore their retirement allowances, were being reduced prospectively because they had been improperly increased under early retirement packages of the sort voided in Fair Lawn, supra, 79 N.J. 574, 401 A.2d 681. Ibid. The Appellate Division reversed the TPAF's order, finding that "all of the petitioners herein having irrevocably changed their positions in reliance on TPAF approval granted almost two years before Fair Lawn for some and up to eight years earlier for others, the interest of justice mandates application of the doctrine of equitable estoppel." Id. at 476, 432 A.2d 560. The court found that if the TPAF had not approved the retirement packages, the petitioners "could have remained in their tenured positions and thus amassed additional pension benefits. It was this opportunity which they relinquished permanently and irrevocably by their retirement." Id. at 479, 432 A.2d 560.
As the Board admitted in its rule proposal, its approach to "fold-ins of extra compensation" had been inconsistent and unclear prior to adoption of the rule. 31 N.J.R. 3932 (December 6, 1999). In the present case, however, as in the Wolfersberger case, there is insufficient evidence of the detrimental reliance that is needed to invoke estoppel. The individual appellants gave up longevity pay and vacation days that could have been sold back, both types of income that would not have been included for pension credit. What they received in exchange was additional income in the form of "senior status" pay that they hoped would be included for pension credit. The pay was received; only the hoped-for pension credit was denied. The individual appellants who had not yet retired had not relied upon the larger amount of creditable compensation to change their position. Thus, they were in the same position as the Wolfersberger plaintiff; having never received the hoped-for benefits, they could not allege a claim of reliance, and the principle of estoppel could not be applied. The sole individual appellant who had retired, Wheeler, is apparently receiving pension credit for his "senior status" pay under the "grandfathering" provision of N.J.A.C. 17:4-4.1(i), *690 so he also can claim no detrimental reliance. Similarly, any of the appellants who retire before the collective bargaining agreement expires or December 31, 2001, whichever comes first, will obtain the same result.
Another way to look at reliance could be that for the two or three contract negotiation periods that occurred since 1986 for the superior officers and 1989 for the patrol officers and detectives, there was a lost opportunity to bargain for other regular salary increases that would have been available for pension credit. For all that period, however, the relevant statute limited pension credit for compensation that did not include adjustments "granted primarily in anticipation of the member's retirement." N.J.S.A. 43:16A-1(26). Moreover, in February 1998 the Wilson court gave reason for doubt that the "senior status" approach would allow full pension credit, but the SOA agreement signed in July 1998 continued to include the "senior status" pay, and the simultaneous ending of longevity pay and vacation day accrual. Thus, this does not appear to be a valid basis for a claim of reliance that would support entering an estoppel order against the Board.
Even under the Board's regulation that pre-dated the current version,[2] the "senior status" pay increase would not have been creditable for pension purposes. That prior rule, adopted effective November 7, 1983, specified that only base salary, and not "extra compensation," would be creditable for pension benefits. The "senior status" easily fits within this description of "extra compensation," so even when it was first negotiated in 1986 appellants could not have reasonably relied upon the enhanced pension credit they hoped would accompany the "senior status" pay they received.
Affirmed.[3]
APPENDIX
As adopted in February 2000, N.J.A.C. 17:4-4.1 now provides:
(a) The compensation of a member subject to pension contributions and creditable for retirement and death benefits in the system shall be limited to base salary, and shall not include extra compensation.
1. "Base salary" means the annual compensation of a member, in accordance with established salary policies of the member's employer for all employees in the same position, or all employees covered by the same collective bargaining agreement, which is paid in regular, periodic installments in accordance *691 with the payroll cycle of the employer.
2. "Extra compensation" means individual salary adjustments which are granted primarily in anticipation of a member's retirement or as additional remuneration for performing temporary duties beyond the regular workday. Forms of compensation that have been identified as extra compensation include, but are not limited to:
i. Overtime;
ii. Pay for extra work, duty or service beyond the normal work day or normal duty assignments;
iii. Bonuses;
iv. Lump-sum payments for longevity, holiday pay, vacation, compensatory time, accumulated sick leave, or any other purpose;
v. Any compensation which the employee or employer has the option of including in base salary;
vi. Sell-backs, trade-ins, waivers, or voluntary returns of accumulated sick leave, holiday pay, vacation, overtime, compensatory time, or any other payment or benefit in return for an increase in base salary;
vii. Individual retroactive salary adjustments where no sufficient justification is provided that the adjustment was granted primarily for a reason other than retirement;
viii. Individual adjustments to place a member at the maximum of his or her salary range in the final year of service where no sufficient justification is provided that the adjustment was granted primarily for a reason other than retirement;
ix. Increments or adjustments granted for retirement credit;
x. Increments or adjustments in recognition of the member's forthcoming retirement;
xi. Any form of compensation which is not included in the base salary of all employees in the same position or covered by the same collective bargaining agreement or employment policy who are members of the retirement system and who receive the compensation;
xii. Retroactive increments or adjustments made at or near the end of a member's service, unless the adjustment was the result of an across-the-board adjustment for all similarly situated personnel; and
xiii. Any form of compensation which is not included in a member's base salary during some of the member's service and is included in the member's base salary upon attainment of a specified number of years of service.
(b) The Board may question the compensation of any member or retiree to determine its credibility where there is evidence that compensation reported as base salary may include extra compensation.
(c) Extra compensation shall not be considered creditable for benefits and all employee contributions made thereon shall be returned without interest.
The rule contains additional provisions regarding the PFRS's investigation and enforcement of the rule, including the following:
(g) A determination by the Board that a member's compensation for pension purposes includes extra compensation may result in:
1. A denial of credit for the extra compensation;
2. An audit of the retirees and the active employees of the employer to *692 identify any additional cases of such extra compensation;
3. A return of contributions to the active members and retirees on the extra compensation without interest;
4. A recalculation of the retirement benefits of retirees to eliminate benefits based upon the extra compensation; and
5. Repayment to the system by the retiree of any benefits received based upon the extra compensation.
[N.J.A.C. 17:4-4.1(g).]
A "grandfathering" section of the rule further provided:
(i) This section shall not be applicable to longevity pay, holiday pay, or education pay which is included in the creditable compensation of a retiree or member on a mandatory basis in accordance with the provisions of a collective negotiations agreement or employment policy of an employer approved and executed on or before January 1, 2000, until the termination date of the collective negotiations agreement or employment policy, or December 31, 2001, whichever occurs first.
[N.J.A.C. 17:4-4.1(i).]
The published Summary describing the intended purpose of the rule proposal included the following:
It is clear from the basic design of the retirement system and the definition of "compensation" that the law contemplates a system of employer and employee contributions on the regular weekly, bi-weekly or monthly base salary of members to fund death or retirement benefits based upon such regular salary in the year before death or retirement. "Compensation" for pension purposes is not intended to include temporary remuneration such as bonuses or overtime pay, or adjustments in anticipation of retirement to enhance retirement benefits.
The proposed new rule attempts to clarify this area by indicating specific types of remuneration which are not includable for pension purposes. Unfortunately, there is still a significant amount of misunderstanding or lack of understanding among employers, members, and member representatives on this subject. The lack of clarity on what types of remuneration may be included in compensation for pension purposes has led to many cases where the Board of Trustees has had to review the compensation of members about to retire or already retired, and to deny the use of certain remuneration in the calculation of retirement benefits. In some cases, the benefits of retirees had to be recalculated and the retirees had to repay the retirement system for benefits they received based upon the excluded remuneration. These cases have usually involved situations where some forms of compensation, such as longevity or holiday pay, were not included in members' base pay for most of their working careers, but were included when the members' service was close to eligibility for retirement, for example, beginning in the 20th year of service. The benefits based upon the compensation were not adequately funded through employer and employee contributions. If compensation handled in this manner is not excluded from benefit calculations, the unfunded liability of the retirement system is increased and must be paid for by all employers.
[31 N.J.R. 3930 (December 6, 1999).]
NOTES
[1] The new regulation and the Board's summary of its purposes appear at the end of this opinion as an appendix.
[2] The prior regulation read as follows:

(a) Only a member's base salary shall be subject to pension contributions and creditable for retirement and death benefits in the system.
(b) The board shall reserve the right to question any salary to determine its creditability where it is evident from the record that a salary reported for benefits includes extra compensation.
(c) Such extra compensation shall not be considered creditable for benefits and all contributions made thereon shall be returned.
(d) Some of the forms of compensation that have been defined as extra compensation include overtime; bonuses; longevity lump sum payments; individual retroactive salary adjustments or individual adjustments to place a member at the maximum of his or her salary range in the final year of service; increments granted for retirement credit or in recognition of the member's forthcoming retirement or in recognition of the member's years of service in the community.
[15 N.J.R. 1238 and 1871; N.J.A.C. 17:4-4.1 (Supp.1-3-84)(now repealed).]
[3] Since the Board concedes that the individual appellants have standing, we will not consider its contention that the union lacked standing.